# IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE

# IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| BETTY A. SWEETMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. CPU4-15-000053 |
| | ) | |
| STATE FARM MUTUAL | ) | |
| AUTOMOBILE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: August 21, 2015
Decided: December 30, 2015

Richard A. DiLiberto, Esquire
Young, Conaway, Stargatt & Taylor, LLP
1000 N. King Street
Wilmington, DE 19801
*Attorney for Plaintiff*

Colin M. Shalk, Esquire
Casarino, Christman, Shalk,
Random & Doss, P.A.
405 N. King Street, Suite 300
P.O. Box 1276
Wilmington, DE 19899
*Attorney for Defendant*

## DECISION AFTER TRIAL

**SMALLS, C.J.**

Betty A. Sweetman ("Plaintiff"), on January 6, 2015, brought this breach of contract action seeking compensatory damages against State Farm Mutual Insurance Company ("State Farm") alleging State Farm improperly, unreasonably and with bad faith denied Personal Injury Protection ("PIP") benefits under an insurance agreement between the parties. Plaintiff also sought payment for medical expenses; general damages, including pain and suffering; punitive damages; attorney's fees; costs, and; interest.[1] On February 27, 2015, State Farm filed an answer denying liability, and asserting affirmative defenses.

On August 12, 2015, the Court held trial. At the conclusion of trial, the Court reserved its decision and ordered the parties to submit post-trial letter memoranda explaining the effect of *Stayton v. Del. Health Corp., et al.*,[2] a recent Delaware Supreme Court decision, on the present case. After considering the testimony and evidence presented by the parties, as well as their respective legal arguments, this is the Court's final decision after trial.

## FACTS

At trial, the Court heard live testimony from Plaintiff, her husband, John Sweetman ("Mr. Sweetman"), and David Weisenhofer ("Weisenhofer"), a State Farm claims adjuster. Both parties also submitted video depositions of medical experts and other documentary evidence for the Court to consider.[3] After carefully reviewing the record and assessing the testimony, the Court finds the facts as follows:

---

[1] Plaintiff amended her Complaint on March 30, 2015, after stipulating with State Farm and with leave from the Court, in order to correctly name State Farm as the answering party. Plaintiff amended her Complaint for a second time on April 27, 2015, with no opposition from counsel and with leave from the Court, in order to withdraw any "bad faith" claims and include an additional medical bill.

[2] 117 A.3d 521, 522 (Del. 2015).

[3] Plaintiff submitted a video deposition of Dr. Pawan Rastogi, and State Farm submitted a video deposition of Dr. Eric T. Schwartz.

## A. Plaintiff's Medical Posture

On November 15, 2013, Plaintiff was driving on Route 299 towards Christiana Hospital when her vehicle was struck in the rear by another vehicle (the "November 2013 accident"). As a result of the impact, her head collided sharply with the car's headrest. Plaintiff, who was 69 years old at the time of the accident, testified that she felt dazed and confused after the collision.[4] After the police arrived, Plaintiff complained of neck pain and was transported to Christiana Care in Middletown, Delaware for emergency care.

Plaintiff testified that after the November 2013 accident, she was experiencing shooting pains in her neck and arms while sleeping. To alleviate this pain, she sought acupuncture treatment and physical therapy treatment.[5] Both forms of treatment, however, were unsuccessful. Plaintiff also began seeing Dr. Barry Bakst at the Delaware Back Pain and Sports Rehabilitation Center for rehabilitative care.

On January 15, 2014, Dr. Patel, from the Delaware Back Pain and Sports Rehabilitation Center, diagnosed Plaintiff with ridiculopathy, a condition in which the nerve root is damaged and prohibits the nerve from properly functioning.[6] Dr. Patel also found that Plaintiff had a limited range of motion in her neck that resulted from a cervical disc protrusion.

During Plaintiff's treatment with Dr. Bakst, he recommended that Plaintiff obtain an MRI of her cervical spine, and referred Plaintiff to Dr. Rastogi, a neurosurgeon at Delaware

---

[4] After the collision, Plaintiff checked on the condition of the other driver and attempted to call 9-1-1, but instead dialed 9-1-4. On two separate occasions shortly following the accident—during a phone call with her husband, and when speaking to the police who responded to the accident—Plaintiff mistakenly stated that the accident occurred on Route 13.

[5] Plaintiff underwent physical therapy from November 2013 to March 2014.

[6] *See* Pl.'s Ex. 3. This diagnosis was based on the fact that Plaintiff was experiencing shooting pains in her left arm.

3

Neurosurgical Group, P.A.[7]  When Dr. Rastogi first evaluated Plaintiff on March 12, 2014, Plaintiff indicated that she was experiencing significant neck pain that radiated onto her left shoulder and intermittently down her left arm.  Dr. Rastogi testified that Plaintiff also complained of numbness and tingling in her left hand and occasionally on the right side of her body, however, the bulk of her pain was in her neck.  When Dr. Rastogi examined Plaintiff, he found her neck to be tender and saw that her motion was restricted.

Dr. Rastogi also reviewed the results of Plaintiff's MRI.  Dr. Rastogi testified that the MRI revealed that Plaintiff was suffering from a number of anterior cervical issues, including cervical disc protrusion (a condition in which a bulged disc has placed pressure on nerve roots in the neck); significant cervical spondylosis (a condition in which, due to age, the spinal discs dehydrate and shrink), and a large disc osteophyte complex (a spinal abnormality that causes the space between vertebrae to calcify and harden), which caused spinal cord compression at C4–5 in Plaintiff's neck.  Dr. Rastogi also testified that the MRI results revealed symptoms of early myelopathy, which is a compression of the spinal cord in the neck that causes a neurologic deficit in the spinal cord itself.[8]  He explained that myelopathy

---

[7] Dr. Rastogi graduated cum laude from Albany Medical College in 1997, was the attending neurosurgeon for the United States Air Force for four years, and was previously the Chairman of the Department of Neurosurgery in the United States Air Force at Wilford Hall Medical Center.  In 2001, he became affiliated with Christiana Hospital.  He is licensed to practice medicine in Maryland and Delaware. The Court finds Dr. Rastogi to be a credible expert witness.

[8] According to the American Journal of Neuroradiology:

> Myelopathy describes any neurologic deficit related to the spinal cord. Myelopathy is usually due to compression of the spinal cord by osteophyte or extruded disk material in the cervical spine. Osteophytic spurring and disk herniation may also produce myelopathy localized to the thoracic spine, though less commonly. Other common sources of myelopathy are cord compression due to extradural mass caused by carcinoma metastatic to bone, and blunt or penetrating trauma.

4

can be caused by trauma or it can also develop progressively over time as degenerative condition.

Dr. Rastogi testified that, in his opinion, Plaintiff had "pre-existing degenerative changes that were clearly exacerbated and worsened by her motor vehicle accident."[9] He explained that it was clear that she had preexisting cervical spondylosis; however, the spondylosis was not causing any symptoms and therefore, was not bothering her.[10] He further explained that when Plaintiff was rear-ended in the November 2013 accident, a significant force applied to her neck, which resulted in a cervical strain and "significant movement of the spinal cord" that lead to inflammation and swelling.[11] This created a problem, he further explained, because when "the root, the nerve and the cord are swollen, if the canal space is significantly compromised . . . , the normal conservative treatments don't work, meaning that the inflammation doesn't die down. It just keeps getting reaggravated . . . and her symptoms persist."[12]

Based on these findings, Dr. Rastogi informed Plaintiff that she should undergo an anterior cervical discectomy, a surgical procedure where the compressed bones are removed and then replaced with a bone graft that fuses the vertebrae together, in order to decompress the spinal cord. Plaintiff testified that Dr. Rastogi informed her of the risks of not

---

American Journal of Neuroradiology, *Myleopathy* (last modified May 2008) <http://www.ajnr.org/content/29/5/1032>.

[9] Pl. Ex. 9

[10] Specifically, Dr. Rastogi testified that "[C]learly it was compensated, meaning that it wasn't causing any symptoms. And if it was causing symptoms, it was very mild symptoms that she didn't report to anybody or didn't bother her." Pl. Ex. 7; Rastogi Dep. 27:9–12, May 19, 2015.

[11] Rastogi Dep. 27:19–20, 21–23.

[12] *Id.* at 28:1–8.

performing surgery, and warned her that she could be permanently paralyzed if she were to be injured in another accident.

Ultimately, on July 7, 2014, Dr. Rastogi operated on Plaintiff. Dr. Rastogi testified that he saw that bone spurs were clearly pressing on Plaintiff's spinal cord. He believes the surgery was medically necessary and directly caused by the November 2013 accident because Plaintiff began exhibiting ongoing symptoms in her after the accident. Specifically, Dr. Rastogi testified, "[The symptoms] started right after the accident and they have—they continued until [the] surgery. So clearly, those symptoms are related to the car accident."[13] Dr. Rastogi also believed that the anterior cervical discectomy was necessary because none of treatment that Plaintiff received prior to the surgery was effective.

Plaintiff testified that prior to the November 2013 accident she worked twelve hours per week at Macy's Department Store. After the surgery, however, Plaintiff was unable to work, and therefore lost wages in the amount of $728.64.[14]

### B. Plaintiff's PIP Claim

At all times relevant to this matter, Plaintiff was insured by State Farm.[15] Weisenhofer was assigned to Plaintiff's case after State Farm was notified of the November 2013 accident.[16] According to Weisenhofer, following an accident claim, State Farm identifies the parties involved and becomes familiar with what type of insurance coverage is available to its insured. In this case, Weisenhofer made initial contact with Plaintiff and sent

---

[13] *Id.* at 59:22–24.
[14] Pl. Ex. 5.
[15] Pursuant to her insurance policy, Plaintiff paid $226.08 on a premium for PIP/no-fault coverage. *See* Pl. Ex. 1.
[16] Weisenhofer is employed as an underwriter for State Farm in the highest designation an underwriter can attain. He has worked in this role since November 2013. At the time of the November 2013 accident, Weisenhofer was licensed in Delaware as an insurance adjuster.

her a letter detailing the coverage she was entitled to under her policy. In addition to the letter, Weisenhofer also sent Plaintiff a PIP benefits application.

On November 25, 2013, ten days after the accident, Plaintiff filled out the application for PIP benefits, seeking coverage for medical expenses incurred from her initial emergency room visit and subsequent physical therapy treatment, and sent the application to State Farm.[17] In the application, Plaintiff listed the following injuries: "head injury, low back pain, dizzy, confused and disoriented, neck pain, headaches."[18]

On December 6, 2013, Weisenhofer reviewed the initial medical records from the emergency room and Plaintiff's PIP application.[19] On December 17, 2013, Weisenhofer reviewed x-rays taken at the emergency room on the night of the accident. Weisenhofer then sent Plaintiff's application to his supervisor for further review. On February 18, 2014, State Farm granted Plaintiff's claim for medical expenses that Plaintiff incurred on the night of the accident. When State Farm granted Plaintiff's request, Weisenhofer called Plaintiff and left her a voicemail, asking Plaintiff contact him and provide an update on her injuries. Weisenhofer testified that he did not receive a returned call or voicemail from Plaintiff.

On March 10, 2014, Weisenhofer completed a final review of Plaintiff's file and called Plaintiff for the second time and requested an update. Plaintiff returned Weisenhofer's call two days later, on March 12, 2014.[20] At that time, Weisenhofer learned that Plaintiff was under Dr. Rastogi's care and that surgery appeared to be necessary based

---

[17] *See* Pl. Ex. 2.
[18] *Id.*
[19] Weisenhofer testified that while Plaintiff provided her employment information in her PIP application, she did not claim lost wages. He conceded however, that he was on notice of a potential wage loss claim.
[20] Weisenhofer testified that Plaintiff was not the person who actually returned the call. Additionally, Weisenhofer also testified that Plaintiff's file does not identify who returned the call.

7

on Plaintiff's nerve condition. Weisenhofer testified that State Farm protocol requires that when a surgery appears to be necessary, the claims adjuster must solicit secondary documents from the treating physician regarding the causation of the injury. At this point, Weisenhofer referred the claim to Joan Barker ("Barker"), an Injury Claim Trainer with State Farm.[21] Barker drafted a causation document, which contained questions about Plaintiff's injury and the proposed treatment, and sent the document to Dr. Rastogi on April 29, 2014 via facsimile.[22] State Farm did not receive a response.

On June 6, 2014 Weisenhofer called Dr. Rastogi and left a voicemail for Dr. Rastogi regarding the causation document. Subsequently, Dr. Rastogi completed the document and returned it to State Farm.[23] On June 25, 2014, State Farm sought a utilization review from Dr. Schwartz, an orthopedic surgeon,[24] in an attempt to independently determine the causation of Plaintiff's injury and the rationale for her proposed treatment.[25] Dr. Schwartz reviewed Plaintiff's medical records and the police collision report. Dr. Schwartz concluded that while Plaintiff's initial medical expenses—those that she incurred from her emergency room visit following the accident and the subsequent physical therapy treatment—were directly related to the November 2013 accident, in his opinion, the proposed anterior cervical discectomy was not directly related to the accident.[26] In reaching this conclusion,

---

[21] The purpose of this position is to assist the underwriter with determining the causation of the injury and the rationale for the proposed treatment.

[22] *See* Def. Ex. 1.

[23] The completed causation document was not presented to the Court for review.

[24] Dr. Schwartz is a board certified orthopedic surgeon. He graduated from New York University School of Medicine in 1988, was a chief resident at the State University of New York in 1992, and is currently employed by Delaware Orthopaedics and Sports Medicine, P.A.

[25] The utilization review requires the physician to examine all of the claimant's medical records and documents on file.

[26] *See* Pl. Ex. 10.

Dr. Schwartz relied on the fact that, for the first four months after the November 2013 accident, there was "no evidence of any myelopathy" in any doctor's evaluation of Plaintiff, nor did Plaintiff exhibit any clinical signs of cervical myelopathy.[27]    Specifically, Dr. Schwartz found that the MRI of Plaintiff's neck did not show evidence of trauma that would produce a cervical myelopathy.  Instead, he found that the results revealed significant pre-existing degenerative changes not directly related to the November 2013 accident.  Based on Dr. Schwartz's report, State Farm denied coverage for the anterior cervical discectomy, reasoning that the surgery was not directly related to the November 2013 accident.

Ultimately, Plaintiff incurred $72,789.12 in medical expenses.[28]  Of that amount, State Farm paid $33,205.34.[29]  Plaintiff submitted the remaining unpaid amount of $54,424.75 to Medicare,[30] and of that amount, Medicare paid $25,187.61.[31]

## PARTIES' CONTENTIONS

Plaintiff maintains that State Farm breached the parties' insurance agreement by failing to pay for expenses she incurred as a result of the November 2013 accident.  Plaintiff argues that the anterior cervical discectomy was medically necessary and directly caused by the accident.  In support of this contention, Plaintiff relies on the expert testimony provided by Dr. Rastogi.  Dr. Rastogi explained that Plaintiff complained of neck pain and shooting pain radiating to her left arm and neck only *after* the accident.  Dr. Rastogi also noted that Plaintiff's medical history did not indicate that she had any cervical issues prior to the

[27] Specifically, Dr. Schwartz relied on the notes from Delaware Back Pain and Sports Rehabilitation Center. Def. Ex. 2–A; Schwartz Dep. 16:8–13, July 22, 2015.
[28] Pl. Exs. 4, 5, 10.
[29] This amount consists of bills submitted to State Farm after the accident and up until the July 7, 2014 surgery.
[30] Pl. Ex. 6
[31] *Id.*

9

November 2013 accident. Based on these findings, Dr. Rastogi concluded that the anterior cervical discectomy was medically necessary and directly caused by the accident. Therefore, Plaintiff argues that she is entitled to reimbursement for her medical expenses and lost wages that she incurred as a result of the anterior cervical discectomy.

State Farm maintains that the anterior cervical discectomy was not directly caused or related to the November 2013 accident, and therefore, argues that it is not liable to Plaintiff for any of her expenses incurred as a result of that surgery. State Farm relies on the expert testimony provided by Dr. Schwartz to support its argument. In his video deposition, Dr. Schwartz testified that Plaintiff's surgery was not directly related to the November 2013 accident. Dr. Schwartz testified that he based his opinion on the fact that Plaintiff did not complain of any neck pain on the night of the accident,[32] and that Plaintiff's medical records from November 15, 2015 through March 13, 2014 were void of any complaints from Plaintiff that may indicate that she was suffering from myelopathy. According to Dr. Schwartz's review, all tests implicating myelopathy came back as normal, and showed that Plaintiff had a "very stable neck." Dr. Schwartz testified that any sign of myelopathy would have been apparent within the first two months following the accident. Therefore, State Farm maintains that it is not liable for any expenses that Plaintiff incurred as a result of the surgery.

---

[32] This fact is in dispute, as Plaintiff argues that she *did* complain of neck pain while she was in the emergency room. Additionally, in his notes, Dr. Schwartz noted that Plaintiff's records were "hard to read," however, when questioned about this notation during trial, Dr. Schwartz insisted that the records did not indicate that Plaintiff complained of neck pain on the day of the accident.

10

## DISCUSSION

Delaware law "requires owners of Delaware-registered motor vehicles to obtain certain 'minimum insurance coverage.'"[33] Under 21 *Del. C.* § 2118, insurance carriers are required to provide "[c]ompensation to injured persons for reasonable and necessary expenses" that are related to a motor vehicle accident for which the insured's policy covers.[34] In order to prove that medical expenses are reasonable and necessary under § 2118, the insured must present medical expert testimony that establishes "a causal link between the accident and the insured's injuries."[35] Thus, the insured must establish, by a preponderance of the evidence, that "the medical services received were necessary and that the bills or charges for such services were reasonable."[36] In determining whether the insured has met this burden, the Court, which serves as the fact-finder in a non-jury trial, has the sole responsibility in assessing the credibility of each witness.[37]

First, the Court must determine whether the anterior cervical discectomy was a necessary medical procedure in accordance with § 2118. Dr. Rastogi and Dr. Schwartz agree that Plaintiff had a pre-existing degenerative cervical spondylosis. Their opinions differ, however, as to whether the accident exacerbated that condition. Dr. Schwartz opined that Plaintiff's condition was not exacerbated because she showed no signs of myelopathy immediately following the accident, which in his opinion, meant that her injuries were not

---

[33] *Kelty v. State Farm Mut. Auto. Ins. Co.*, 73 A.3d 926, 930 (Del. 2013).

[34] 21 *Del. C.* § 2118(a)(2).

[35] *State Farm Mut. Auto. Ins. Co. v. State Dep't of Natural Res. & Envtl. Control*, 2011 WL 2178676, at *2 (Del. Super. May 31, 2011).

[36] *Mangene v. State Farm Ins.*, 2015 WL 4603052, at *3 (Del. Com. Pl. May 28, 2015) (quoting *Watson v. Metropolitan Property and Cas. Ins. Co.*, 2003 WL 22290906, at *5 (Del. Super. Ct. Oct. 2, 2003 (citing 17 Lee R. Russ & Thomas F. Segalla, Couch On Insurance § 254:59 (3d ed. 2001)) (internal brackets omitted).

[37] *Nat'l Grange Mut. Ins. Co. v. Nelson F. Davis, Jr. et. al.*, 2000 WL 33275030, at *4 (Del. Com. Pl. Feb. 9, 2000).

trauma-related. On the other hand, Dr. Rastogi explained how the force from being rear-ended impacted Plaintiff's condition, and resulted in a cervical strain and significant movement of the spinal cord, which lead to inflammation and swelling. Dr. Rastogi further explained that while Plaintiff had pre-existing cervical spondylosis prior to the November 2013 accident, she was not suffering from any pain or symptoms of that condition until after the accident. Dr. Rastogi attributed this to the fact that the force from the collision applied pressure to Plaintiff's neck and caused her neck to sprain. That cervical sprain, coupled with her already compromised spine, only worsened over time because the normal conservative treatments—i.e. injections, physical therapy, and other rehabilitative care—did not reduce the inflammation and swelling of her spinal cord. In considering both medical expert testimonies, I find Dr. Rastogi's medical opinion to be more compelling because of his clear explanation as to how and why Plaintiff's condition was exacerbated by the November 2013 accident.

Based upon the evidence, I find that Plaintiff has proved by the preponderance of the evidence that her injuries to her spine were caused by the accident, therefore rendering the anterior cervical discectomy that she underwent as medically necessary. Therefore, State Farm is liable for breach of contract for failing to pay Plaintiff PIP benefits to cover the costs of this surgery.

Now the Court must determine the extent of State Farm's liability and the effect, if any, of *Stayton v. Del. Health Corp., et al.*, on the present case. In *Stayton*, the Delaware Supreme Court created an exception to the collateral source rule, finding that medical provider write-offs for a Medicare patient are not payments made to or benefits conferred

12

on that patient.[38]  Generally, under the collateral source rule, if an injured party is compensated for her injuries from a source independent of the tortfeasor, the payment is not admissible to limit the damages paid by that tortfeasor.[39]  However, the *Stayton* Court held that the collateral source rule does not apply to amounts to be written off by Medicare because Medicare write-offs are neither a benefit nor a gratuity conferred on the insured Medicare patient.[40] Instead, Medicare write-offs reflect the agreement between Medicare and the medical provider, which ultimately benefits federal taxpayers.[41]  Therefore, the Court opined, that where the healthcare provider has treated a plaintiff covered by Medicare, the amount paid for medical services by Medicare is the amount recoverable by the plaintiff as medical expense damages.[42]

In relying on *Stayton*, State Farm argues that it should only be liable for the amount paid by Medicare under the collateral source rule.  Plaintiff argues that the *Stayton* rule should not apply in this case because this is an action for breach of contract and in *Stayton*, the action was in tort.  Further, Plaintiff argues that under 21 *Del. C.* § 2118, State Farm is required to pay 100% of her reasonable and necessary expenses incurred within two (2) years from the date of the accident.[43]

Although the collateral source rule is a tort law principle, Delaware courts have applied the rule to Delaware's no-fault statute.[44]  I agree with Plaintiff that the analysis in a

---

[38] *Stayton*, 117 A.3d at 531.

[39] *Yarrington v. Thornburg*, 205 A.2d 1, 2 (Del. 1964).

[40] *Stayton*, 117 A.3d at 531.

[41] *Id.*

[42] *Id.*

[43] 21 *Del. C.* § *2118(a)(2)(a)*.

[44] *Schulze v. State Farm Mut. Auto. Ins. Co.*, 2009 WL 1638609, at *1 (Del. Super. Apr. 2, 2009) (citing *State Farm Mut. Auto. Ins. Co.* v. *Nalbone*, 569 A.2d 71, 75 (Del. 1989)).

13

contract action seeks to reach a different objective than that of a tort action because of the expectation of the parties when they first entered into the contract. In considering those expectations, the Delaware Supreme Court has found "that to properly adhere to the policy behind [§ 2118], the collateral source rule should be analyzed under contract law."[45] Accordingly, it follows that, "double recovery in PIP [is limited] to instances where the injured party has *paid consideration to the collateral source*, in effect, contracting for a double recovery."[46] Ultimately, "[a]side from the requirement that the injured party pay consideration to a collateral source under the collateral source rule, the rule is otherwise unchanged and the PIP carrier is treated as the tortfeasor."[47]

Here, Plaintiff has not paid consideration to Medicare in order to receive some sort of benefit from having Medicare write-offs. As the *Stayton* Court opined, Medicare write-offs are neither a benefit nor a gratuity conferred on the insured Medicare patient. If State Farm must pay, as § 2118 requires, all reasonable and necessary expenses, and Medicare established a rate with the medical providers that set the charges of those medical services at a certain amount, then I fail to see why there is a basis to require State Farm to pay any amount above that amount. It seems to me that the principle announced in *Stayton* regarding the application of Medicare applies equally to both tort and contract actions when medical services are required.

Accordingly, the medical expenses receivable is limited to the amounts paid by Medicare. This does not affect the amounts awarded for lost wages or cost of these

---

[45] *Id.* (citing *Nalbone*, 569 A.2d at 75).
[46] *Id.* (citing *Nalbone*, 569 A.2d at 75) (emphasis added).
[47] *Id.*

14

proceedings. Judgment is entered for Plaintiff for medical expenses in the amount of $54,424.75, however as a result of *Stayton*, this amount is reduced to $25,187.61, and for lost wages in the amount of $728.66, plus costs and post-judgment interest of 5.75% until paid.

**SO ORDERED**

Alex J. Smalls,
Chief Judge